**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**L.B. JEFFERSON,**                                        **CIVIL ACTION**
    **Plaintiff**


**VERSUS**                                              **NO.  14-1711**


**BAYWATER DRILLING, LLC,**                              **SECTION: "E" (4)**
    **Defendant**


## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a maritime action for the recovery for maintenance and cure.  Plaintiff alleges he developed a disabling skin condition on July 16, 2014, while working as a seaman aboard the IDB CAILLOU.[1]  Plaintiff subsequently filed suit against his employer—Baywater Drilling, LLC—seeking maintenance and cure, compensatory damages, punitive damages, and attorneys' fees.  The questions presented are (1) whether Plaintiff is entitled to maintenance and cure, and, if so, (2) whether the denial of benefits was unreasonable or willful and wanton.

This case was tried before the undersigned without a jury.   Having considered the evidence admitted at trial and the arguments of counsel, the Court announces its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52. To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such. To the extent a conclusion of law constitutes a finding of fact, the Court adopts it as such.

---

[1] The skin condition was later diagnosed as Stevens-Johnson Syndrome ("SJS").

**FINDINGS OF FACT**

**I. The Injury and Subsequent Hospitalization**

1. Plaintiff is a seaman employed by Defendant as a roustabout aboard the IDB CAILLOU.

2. Plaintiff's most recent assignment was a six-week hitch scheduled to begin on July 16, 2014.

3. On the morning of July 15, 2o14, Plaintiff was visiting with friends at a Shell gas station in Columbia, Mississippi, when he received a call from his sister, Roseita Jefferson. Ms. Jefferson informed Plaintiff that her truck was not running properly. Ms. Jefferson brought the truck to the Shell station. In order to fix the truck, Plaintiff rented tools from an auto parts store about one block from the Shell station. Plaintiff walked to and from the auto parts store at least twice. Plaintiff did not experience any physical discomfort during this time.

4. After fixing his sister's truck, Plaintiff ran an errand and then went to his sister's house to pack and get ready for his hitch.

5. Plaintiff returned to the Shell station at approximately 7:30 p.m. to await his ride to work—Marcus Grinstead ("Grinstead"). Grinstead arrived at approximately 10:30 p.m. Plaintiff was not in any physical discomfort at this time, nor did Grinstead observe any signs of discomfort.

6. Plaintiff and Grinstead drove together to Defendant's dock in Intracostal City, Louisiana. At some point during their four-hour drive, the two stopped so that Plaintiff could drive. Plaintiff drove the rest of the way to Intracostal City. He did not experience any pain during the trip or while driving.

2

7.  Plaintiff and Grinstead arrived in Intracostal city at approximately 2:15 a.m. on July 16, 2014.  They boarded a crew boat thirty minutes later along with several other co-workers.

8.  The crew boat arrived at the IDB CAILLOU at approximately 3:15 a.m.

9.  After unpacking his things and changing into work clothes, Plaintiff ate breakfast and then attended a safety meeting.

10. Plaintiff began his daily work around 6:15 a.m.  He emptied trashcans until summoned by his immediate supervisor, Kenneth Pitre ("Pitre").  Pitre requested that Plaintiff help service two cranes.  Plaintiff's tasks included checking the integrity of the cables and pullies, and carrying around a large set of shackles and a pair of pliers.  Plaintiff completed his tasks without incident and went to lunch at about 10:30 a.m.

11. Following a 20-minute lunch break, Plaintiff relieved the roughnecks on the drill floor and helped "trip" pipes.  While working on the drill floor, Plaintiff began to experience an intense burning sensation in his feet.  Plaintiff left the drill floor at approximately 1:00 p.m. and went to the change room.  Plaintiff removed his boots and socks.  His feet were badly blistered.

12. Plaintiff subsequently contacted Pitre.  Pitre met Plaintiff in the workroom and told him to soak his feet in ice water.  Plaintiff soaked his feet for about 35 minutes, after which he was summoned through the PA system to return to the rig floor.  Plaintiff worked for about 30 minutes and then sought Pitre again.  Plaintiff complained that his feet still hurt.  Pitre ordered Plaintiff to leave the rig floor and to clean things on

the first floor of the vessel.[2]  Plaintiff performed these tasks until approximately 6:00 p.m.  Plaintiff then returned to the change room to soak his feet.

13. While in the change room, Plaintiff was approached by Jimmy Varnes ("Varnes"), the Health, Safety, and Environment coordinator for Defendant.  Varnes observed what he described as "nasty" and "open" blisters on Plaintiff's feet, ankles, arm,[3] and fingers.  Varnes took pictures of Plaintiff's blisters and left the change room briefly.  Varnes returned with a message from his boss: Plaintiff must leave the IDB CAILLOU because he has open wounds.  Plaintiff requested to remain at the vessel overnight and explained that he had not scheduled a ride home from Intracoastal City.  Varnes insisted that Plaintiff leave immediately.  Varnes packed Plaintiff's bags and placed them in the crew boat.

14. By this time, Plaintiff was in so much pain that he was unable to walk.  Plaintiff was carried by hand to the crew boat.  The crew boat departed for Intracoastal City with Plaintiff, Varnes, and two wireline workers.

15. Plaintiff called his friend Darryl Stetney ("Stetney") to request a ride from Intracoastal City.  Stetney reluctantly agreed to make the four-hour drive from Columbia, Mississippi.

16. The crewboat arrived at Intracoastal City at approximately 9:30 p.m.  Plaintiff was carried to the shore and placed on a tree stump.  Plaintiff was then loaded into the truck of the wireline workers.  The wireline workers volunteered to drive Plaintiff to Lafayette, Louisiana.

17. Plaintiff notified Stetney that he was being taken to Lafayette.

---

[2] The testimony was unclear regarding the tasks Plaintiff performed after he left the rig floor.
[3] The testimony was unclear whether Varnes observed blisters on Plaintiff's left arm or instead on his right arm.

18. The wireline workers deposited Plaintiff at a Racetrac gas station in Lafayette some time in the middle of the night.[4]  Plaintiff was unable to stand while waiting for Stetney so he lay on the sidewalk alone, writhing in pain.  Plaintiff felt scared and vulnerable.

19. Stetney arrived at approximately 1:30 a.m. on July 17, 2014.  Alarmed at Plaintiff's dire physical condition, Stetney carried Plaintiff to his truck and immediately called an ambulance.

20. The ambulance transported Plaintiff to Lafayette General Hospital ("Lafayette General").  Plaintiff was eventually diagnosed with SJS.  The etiology of Plaintiff's SJS is presently unknown.

21. Upon learning that Plaintiff was receiving treatment in Lafayette General, Ryne Malcolm ("Malcolm")—Defendant's Human Resources Manager—dispatched Jerald Landry ("Landry") to the hospital.  Landry is a claims adjuster with American Claims Services.  His job is to ascertain basic information about injured personnel, including the purpose of their visit to the hospital and the circumstances surrounding the injury.  Landry also attempts to obtain a signed medical authorization.  Landry does not interview doctors, review medical records, or make medical determinations.

22. Landry identified himself to Plaintiff as a representative of Defendant.  Plaintiff signed a medical authorization.  Landry then began asking non-medical questions about Plaintiff's past, including his criminal record and employment history.  On the advice of one of the nurses—who felt Landry was needlessly harassing her patient—Plaintiff revoked his medical authorization.  Landry was then asked to leave.

---

[4] The record is unclear exactly when Plaintiff arrived at the gas station.

23. Landry reported to Defendant that he did not obtain any medical records or medical authorization.

## II.  Maintenance and Cure

24. Plaintiff was released from Lafayette General on July 25, 2014.  He continued to treat at various medical facilities and eventually underwent debridement surgery on his hands, feet, and left forearm.  Plaintiff received further treatment after the surgery.  He treated with Dr. Oswalt on October 17, 2014, November 3, 2014, and December 15, 2014.  A fourth appointment is scheduled for January, 2015.

25. Following his release from Lafayette General, Plaintiff moved in with his sister, Roseita Jefferson, and her younger daughter.  Pursuant to this arrangement, Plaintiff was to pay the household bills, including groceries, cable, light and gas.  Those bills totaled approximately $700 per month, or $23.33 per day.[5]

26. The parties have stipulated that Plaintiff will reach maximum possible cure on January 30, 2015 and that his total cure amounts to $84,961.55.[6]

27. The parties have not agreed on the amount of any maintenance award.

## III.  Defendant's Maintenance and Cure Investigation

28. Malcolm performed the maintenance and cure investigation for Defendant.

29. Malcolm telephoned Plaintiff on July 17, 2014.  After speaking with Plaintiff, Malcolm contacted American Claims Services and learned the claims adjuster had been asked to leave the hospital.  Malcolm then spoke with other employees of Defendant who worked with Plaintiff on July 16, 2014.  Finally, Malcolm reviewed incident reports completed in connection with Plaintiff's complaints.

---

[5] This calculation accounts for the fact that a maintenance award may only cover expenditures on food to be eaten by the seaman himself.  *See Hall v. Noble Drilling (U.S.) Inc.*, 242 F.3d 582, 588–89 (5th Cir. 2001).  *See also* R. Doc. 32, p. 4.

[6] R. Doc. 40.

30. Malcolm ultimately concluded Plaintiff's injuries were caused by a pre-existing condition related to herpes or a reaction to the medicine he allegedly brought aboard the IDB CAILLOU.

31. Malcolm orally reported this conclusion to his immediate boss—Lisa Williams ("Williams")—on July 17, 2014.

32. There was no further investigation of Plaintiff's claims.

33. Defendant did not review Plaintiff's medical records.

34. Defendant did not request that Plaintiff be tested for herpes or that any tests be done to establish a connection between Plaintiff's SJS and the medication he allegedly brought to work.

## CONCLUSIONS OF LAW

1. Subject matter jurisdiction is proper under 28 U.S.C. § 1333, which vests federal district courts with original jurisdiction over maritime claims.

2. Maintenance and cure is a contractual form of compensation afforded to seamen who become ill or injured while in service of a vessel.[7]  It is not necessary for the seaman to show his injuries were "sustained because of, or while engaged in, activities required by his employment."[8] So broad is the shipowner's obligation that it extends even to injuries pre-existing employment,[9] provided that those injuries are aggravated or become manifest while the seaman is in service of the vessel.[10]  Any

---

[7] *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 212 (5th Cir. 2006) (per curiam).

[8] *Aguilar v. Standard Oil Co. of N.J.*, 318 U.S. 724, 732 (1943); *see also Liner v. J. B. Talley & Co.*, 618 F.2d 327, 322 (5th Cir. 1980) ("Ordinarily, a seaman who seeks maintenance and cure need prove only that the injury or illness arose during his employment; no causal connection to his duties need be shown.").

[9] *McCorpen v. Central Gulf S.S. Corp.*, 396 F.2d 547, 548 (5th Cir. 1968) ("Maintenance may be awarded by courts even where the seaman has suffered from an illness pre-existing his employment . . . .").

[10] *See Owens v. Abdon Callais Offshore, LLC*, No. 10-3296, 2011 WL 2443687, at *4 (E.D. La. June 14, 2011) (noting that a seaman is owed maintenance and cure if "his illness or injury occurred, was aggravated or manifested itself while in the ship's service"); 1 Thomas J. Schoenbaum, *Admiralty and*

doubts as to a shipowner's liability for maintenance and cure are resolved in favor of the seaman.[11]

3. The defenses to maintenance and cure are "few and narrowly applied."[12]  "Only some wilful misbehavior or deliberate act of indiscretion suffices to deprive the seaman of his protection."[13]  Such misconduct includes intoxication, venereal disease, and the willful concealment of a pre-existing medical condition.[14]

4. Defendant explicitly disclaimed any such defense at trial.  Instead, the denial of maintenance and cure is based on Defendant's contention that Plaintiff's injuries were manifest *prior* to his service of the vessel.[15]

5. It is undisputed that Plaintiff suffered from severe, debilitating blisters while servicing the IDB CAILLOU.  Even if those blisters were manifest (in some form) prior to Plaintiff's anticipated hitch, Plaintiff's condition significantly worsened while he was "subject to the call of duty as a seaman, and earning wages as such."[16]

6. Plaintiff is owed maintenance and cure.  The Court must now determine quantum.

7. The right to maintenance and cure terminates when the seaman reaches "maximum possible cure," *i.e.*, "where it is probable that further treatment will result in no

---

*Maritime Law* § 6-30 (5th ed. 2014) ("In order to recover maintenance and cure, the seaman must prove that he suffered illness or injury or that his disability was aggravated or became manifest while he was in the service of the vessel."); *Nelson v. Cenac Towing, Inc.*, 599 F. Supp. 2d 721, 726 (E.D. La. 2009) ("It is not necessary for the claimant to show that his injury or ailment originated during the term of his employment. The employer is liable even for pre-existing conditions that manifest themselves during the voyage."); *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 530 (1938) (approving maintenance and cure award of injury "which manifests itself during [the seaman's] employment, but is not caused by it.").

[11] *Vaughn v. Atkinson*, 369 U.S. 527, 532 (1962).

[12] *Simon v. Can Do II, Inc.*, 89 F.3d 240, 242 (5th Cir. 1996).

[13] *Aguilar*, 318 U.S. at 731.

[14] *See id; Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 171 (5th Cir. 2005) (describing elements of so-called "*McCorpen* Defense").

[15] *See* R. Doc. 22, p. 6; R. Doc. 34, p. 5–6.  Defendant presented evidence that Plaintiff revealed blisters to his co-workers prior to boarding the vessel and that he openly complained of a pre-existing condition for which he had previously sought medical treatment.

[16] *See Aguilar*, 303 U.S. at 529.

betterment of the seaman's condition."[17]  Plaintiff will reach maximum possible cure on January 30, 2015.

8. "Maintenance" is a *per diem* living allowance paid when a seaman is outside the hospital and has not yet reached maximum possible cure.[18]  "Cure" involves the payment of therapeutic, medical, and hospital expenses until the plaintiff reaches maximum possible cure.[19]

9. Maintenance payments cover the reasonable cost of food and lodging.[20]  The seaman's burden to establish the value of maintenance is "feather light," and his own testimony regarding the reasonable cost of room and board in his community is sufficient to sustain an award.[21]

10. The Fifth Circuit has set forth a three-part test for determining the amount of a maintenance award.[22]  First, a court estimates the plaintiff's *actual* costs of food and lodging, and the *reasonable* cost of food and lodging for a single seaman in the plaintiff's locality.[23]  The court then compares those costs to each other.[24]  When actual expenses exceed reasonable expenses, the court should award reasonable expenses.[25]  Conversely, when reasonable expenses exceed actual expenses, ordinarily the court should award actual expenses.[26]  But if the latter scenario obtains, the court proceeds to the third step and inquires whether the plaintiff's

---

[17] *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002).
[18] *Pelotto v. L & N Towing Co.*, 604 F.2d 396, 401 (5th Cir. 1979).
[19] *Id.*
[20] *Hall*, 242 F.3d at 587.
[21] *Yelverton v Mobile Labs., Inc.*, 782 F.2d 555, 558 (5th Cir. 1986).
[22] *See Hall*, 242 F.3d at 590.
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *See id.*

actual expenses are inadequate to provide him with reasonable food and lodging.[27] When actual expenses are inadequate, the court should award reasonable expenses.[28]

11. As discussed above, Plaintiff has satisfied his "feather light" burden of proving actual expenses in the amount of $23.33 per day.

12. Having determined actual expenses, the Court must now estimate reasonable expenses.  In making this estimate, the Court may consider a variety of factors including "actual costs, evidence of reasonable costs in the locality or region, union contracts stipulating a rate of maintenance or per diem payments for shoreside food or lodging while in the service of a vessel, and maintenance rates awarded in other cases for seamen in the same region."[29]  Where, as here, the seaman does not present evidence of reasonable expenses, "a court may take judicial notice of the prevailing rate in the district."[30]  Courts in the Eastern District of Louisiana have approved maintenance rates ranging from $30 to $40 per day.[31]

13. The Court finds that a maintenance award of $40 per day is appropriate in this case.

14. Plaintiff's actual expenses are $23.33 per day but his reasonable expenses are $40 per day.  In this scenario—where reasonable expenses exceed actual expenses—a maintenance award should generally not exceed actual expenses.  The Court finds,

---

[27] *Id.*

[28] *Id.*

[29] *Id.* at 590.

[30] *See id.*; *see also Mier v. Wood Towing L.L.C.*, No. 08-4299, 2010 WL 2195700, at *5 (E.D. La. May 28, 2010) (using prevailing maintenance rate in Eastern District where plaintiff presented no evidence of reasonable expenses); *Harrison v. Diamond Offshore Drilling, Inc.*, No. 07-417, 2008 WL 708076, at *22 (E.D. La. Mar. 6, 2008) (same);

[31] *See, e.g.*, *Owens*, 2011 WL 2443687, at *7 (collecting cases and approving $40 rate); *Mier*, 2010 WL 2195700, at *6 (approving $40 rate); *Nelon v. Cenac Towing Co.*, No. 10-373, 2011 WL 289040, at *13 (E.D. La. Jan. 25, 2011) (approving $35 rate).

however, that no reasonable seaman could live on $23.33 per day.[32]  Accordingly, Plaintiff is entitled to recover maintenance at the rate of $40 per day.

15. Plaintiff is owed maintenance from the date he left the vessel, July 16, 2014, to the date of maximum cure, January 30, 2015,[33] less any days spent in the hospital.[34] Plaintiff was hospitalized for a total of 12 days.[35]  Accordingly, Plaintiff is owed maintenance for 186 days.[36]  At a rate of $40 per day, Plaintiff is entitled to a total maintenance award of $7,920.

16. The parties have stipulated to a cure amount of $84,961.55.

17. Defendant's total maintenance and cure obligation is $92,881.55.

18. In addition to a maintenance and cure payment, Plaintiff also seeks compensatory damages, punitive damages, and attorneys' fees.  The damages recoverable for the denial of maintenance and cure fall on an "escalating scale of liability."[37]  A shipowner is entitled to investigate and require corroboration of a claim for maintenance and cure before commencing payment.[38]  "If, after investigating, the shipowner unreasonably rejects the claim," the owner is liable for compensatory damages.[39]  If the denial was not only unreasonable but "callous and recalcitrant,

---

[32] The Court's research indicates that $30 per day is the lowest maintenance award approved by any court in this District since the year 2000.

[33] *See Vella v. Ford Motor Co.*, 421 U.S. 1, 5 n.4 (1975); *Kendrick v. Maersk Ltd.*, No. Civ.A. 04-1147, 2006 WL 2662996, at *5 (E.D. La. Sept. 15, 2006) ("[Plaintiff[ is entitled to maintenance and cure from . . . when he left the vessel[] until . . . the date of maximum cure.").

[34] *Pelotto*, 604 F.2d at 400.

[35] R. Doc. 32, p. 3.

[36] There are 198 calendar days between July 16, 2014 and January 30, 2015.

[37] *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir. 1987).

[38] *Id.*

[39] *Id.*

arbitrary and capricious, or willful, callous and persistent," the shipowner is also liable for punitive damages and attorneys' fees.[40]

19. Although each case is evaluated on its facts, "it is clear that laxness in investigating a claim that would have been found to be meritorious will subject a shipowner to liability for attorney's fees and punitive damages."[41]

20. The investigation in this case was impermissibly lax, consisting primarily of Malcolm's conversation with Plaintiff, his conversations with Plaintiff's co-workers, and his review of incident reports.  From these sources of information, Malcolm concluded that Plaintiff's injuries were caused by a pre-existing condition related to herpes or a reaction to the medicine he allegedly brought aboard the IDB CAILLOU.

21. There is no evidence that Malcolm or any other representative of Defendant reviewed Plaintiff's medical records or talked to his treating physicians.  Defendant did not offer any medical opinion at trial to support Malcolm's theory of causation.  In fact, Defendant did not order any tests to confirm that Plaintiff had contracted herpes or that his injuries were caused by ingesting medication.  Instead, Defendant made a medical determination without medical evidence.

22. The denial of maintenance and cure was arbitrary and capricious.[42]

23. Plaintiff is entitled to compensatory damages, punitive damages, and attorneys' fees.

---

[40] *Id.*  In 2009, the Supreme Court held that a seaman may recover punitive damages for a shipowner's "willful and wanton disregard of the maintenance and cure obligation."  *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 424 (2009).  This decision abrogated the Fifth Circuit's *en banc* decision in *Guevera v. Maritime Overseas Corp.*, 59 F.2d 1496, 1513 (5th Cir. 1995), in effect restoring the Fifth Circuit's previous case law regarding the availability of punitive damages and attorneys' fees in maintenance and cure cases.  *See Nelon*, 2011 WL 289040, at *22.

[41] *Breese v. AWI, Inc.*, 823 F.2d 100, 104 (5th Cir. 1987).

[42] *See Brees*, 823 F.2d at 104 (finding that an investigation "which did not include an inquiry of any physician . . . or a review of any . . . medical records [] was impermissibly lax under any reasonable standard, rendering [the shipowner's] decision not to pay maintenance and cure . . . arbitrary and capricious.").

24. Under the general maritime law, compensatory damages are those "that have resulted from the failure to pay, such as the aggravation of the seaman's condition, determined by the usual principles applied in tort cases to measure compensatory damages."[43]

25. Based on the evidence presented at trial, Plaintiff is entitled to compensatory damages in the amount of $10,000.

26. As a general rule in maritime cases, punitive damages "should not exceed the amount of compensatory relief awarded."[44]   The Court finds that an award of $10,000 is a sufficient sanction for Defendant's arbitrary and capricious denial of maintenance and cure.

27. The Court also finds that an award of attorneys' fees and costs is appropriate for a case that never should have been tried in the first place.  Plaintiff shall file a motion before the magistrate judge to determine quantum within ten days of the entry of this Order.

28. The final issue is whether prejudgment interest should be awarded.  "It is generally accepted that, under maritime law, the award of prejudgment interest is 'well-nigh automatic.'"[45]   The trial court has discretion to deny prejudgment interest "only where peculiar circumstances would make such an award inequitable."[46]   Peculiar circumstances may be found "where plaintiff improperly delayed resolution of the action, where a genuine dispute over a good faith claim exists in a mutual fault

---

[43] *Morales*, 829 F.2d at 1358.

[44] *Nelon*, 2011 WL 289040, at *22 (citing *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 513–14 (2008)).

[45] *Jauch*, 470 F.3d at 215 (quoting *Reeled Tubing, Inc. v. M/V CHAD G*, 794 F.2d 1026, 1028 (5th Cir. 1986)).

[46] *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.*, 71 F.3d 198, 204 (5th Cir. 1995).

setting, where some equitable doctrine cautions against the award, or where the damages award was substantially less than the amount claimed by plaintiff."[47]

29. There are no such peculiar circumstances in this case.  Accordingly, the Court will award prejudgment interest from the date of loss,[48] which, in this case, is the date Plaintiff left the IDB CAILLOU—June 16, 2014.

30. Admiralty courts "may look to state law and other reasonable guideposts" to determine the rate of prejudgment interest.[49]  The Louisiana judicial interest rate in 2014 was 4.00%.  Accordingly, prejudgment interest will accrue at that rate.

## CONCLUSION

Plaintiff suffered severe and debilitating injury while servicing the IDB CAILLOU.  Rather than arrange treatment for those injuries, Defendant banished Plaintiff from the vessel without warning.  Lacking the physical capability to care of himself, Plaintiff was forced to rely on the charity of the two wireline workers.  But that charity only went so far, and Plaintiff endured hours of mental and physical agony outside and alone until rescued by Stetney in the middle of the night.  Defendant's callous disregard for Plaintiff's well-being is further demonstrated by the deficient maintenance and cure "investigation."  This investigation was impermissibly lax under any reasonable standard.  The Court finds an award of punitive damages is necessary to ensure the next worker who falls ill aboard one of Defendant's vessels receives the treatment he deserves, as a seaman and as a human being.

Plaintiff is entitled to maintenance and cure in the amount of $92,881.55, compensatory damages in the amount of $10,000, and punitive damages in the amount

---

[47] *Reeled Tubing*, 794 F.2d at 1028.

[48] *See id.* ("[I]n this Circuit prejudgment interest is ordinarily awarded from the date of loss.").

[49] *Todd Shipyard Corp. v. Auto Transp., S.A.*, 763 F.2d 745, 753 (5th Cir. 1985).

of $10,000.   Accordingly, the Court will enter judgment in favor of Plaintiff for $112,881.55, with prejudgment interest at 4.00% from June 16, 2014.   Post-judgment interest will accrue at the judicial rate.   Once the Court has determined the appropriate quantum of attorneys' fees, a separate judgment will be entered with identical interest rates.

New Orleans, Louisiana, this 27th day of January, 2015.


_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**